May it please the Court, Sebastian Chain for Petitioner, I mean Appellant, McRic Enterprises. This case involves an honest and reasonable mistake in preparing and understanding a document. The tax court erred in two respects. First, by finding that McRic Enterprises and TS3, Inc. did not make a mutual mistake in drafting their stock purchase agreement such that the tax consequences should be changed to reflect their agreement to structure the transaction as a sale of McRic stock. Second, even if you find that there was no mutual mistake, the tax court erred by not finding that McRic had reasonable cause and acted in good faith for not reporting the sale of Alpha, its subsidiary, on its return and the accuracy related penalty under Section 6662 of the Internal Revenue Code should be removed. Under the law of mutual mistake, there are two requirements. One, that there is an original agreement, and second, that there is a mistake in the reduction of that agreement to writing. In this particular case, there is no evidence showing that there was not at least a unilateral mistake on behalf of the appellant, McRic, and its shareholders. The real issue here is whether or not there is the same mutual mistake on behalf of the opposing party, TS3, Inc. And we think the evidence shows that there is. First, the tax court found in its opinion that Mr. Kisner, Mark Kisner, who was the lead negotiator for McRic in the stock purchase agreement, had several discussions with David Brunson, the lead negotiator for TS3, Inc., and they reached an agreement such that McRic would be the company that would be sold. The original transaction structure involved a different agreement, and then these two parties agreed to structure the transaction for a sale of McRic. However, the tax court found that even though there was that, immediately after that agreement had been reached, Mr. Kisner sent an email to the buyer's counsel, David Rahn, that said, the purchase will be of McRic, therefore memorializing in writing the agreement that had just been reached with the other party. Three days after that agreement had been reached and memorialized in the email, the buyer's counsel made a Scrivener's error and created a new draft of the stock purchase agreement. What's your, go ahead. What's your best case on Scrivener's error? It seems to me it's one thing to drop something one time, but here you had sophisticated documents that were redrafted over and over and over again that plainly said this is not the deal that you think it is. So what's your best case for saying that you can have mutual mistake when repeatedly the deal is laid out very plainly, differently? Well, Judge Owens, the actual negotiations involving that particular structure really took place right before the mistake was made. I'm asking about your best case that once the documents plainly and repeatedly set forth that they don't think what you say, they don't say what you think they should say. What's your best case that says you can ignore that and still have mutual mistake? Yes, and we did cite two cases in which that occurred, in which there was a significant lapse of time between one particular document being drafted and another one being created. I think that was an Eighth Circuit case in which there was an error in a lease that had then been, that was then included in a next, in another document a year later. And we cited another case, I believe that was out of New York, in which a mistake involving a type of proceeds, I believe the terminology was net proceeds. It should have been gross proceeds. That was carried through in five drafts of the agreement. So it's not unprecedented that courts have found that an agreement can carry through various drafts of a document. And, you know, going back to, yes, there is this, the language is clear, but the parties don't go back and renegotiate this particular point of the transaction. They're focusing. Where was, who was counsel for Mr. Kistner at this point? Counsel for the shareholders in McRick, Judge Jones, was Gary Miller. And he was absent during a significant part of the negotiations. He got into a bicycle accident. The tax court found that in its opinion, I believe on page 68 in a footnote. And Mark Kistner also testified that Gary Miller did not tell him that the agreement provided for a sale of Alpha by McRick. Now, Mr. Miller did not testify at trial. He was adverse to the parties at this point because he was being sued for malpractice. So, you know, he was not called at trial. So, and, you know, there's a couple other points here in terms of showing the mistake perpetrated forward. You know, the. Well, wait a minute, though. He's the agent of the, who normally drafts the documents in a sale like this? Doesn't the seller normally draft them? Normally, the buyer is who prepares this. And in this particular case, that's exactly what happened. Buyer's counsel. Buyer's counsel was the one who prepared the draft immediately after the email was issued, which resulted in the. Copies of every draft went to Mr. Miller, right? Or not? I don't know exactly whether. Bicycle accident or not was used. Presumably they would have. And the tax court also found that Mr. Kistner was reviewing those particular documents. But he didn't realize that it called for a sale of Alpha. That was, that's stated in the tax court's opinion on numerous occasions. But to the extent that you disagree with us about whether or not there is a mutual mistake, that brings us to the next point. That the tax court also erred in terms of finding that there was no. I thought the tax court found that Kistner, with his attorney, reviewed the documents. They did find that they reviewed the documents, Judge Jones, but the tax court also found that Kistner did not realize that it called for a sale. I'm sure he didn't. But that's why you have a lawyer and an accountant, and they messed up on, with both of them. They did, and that actually goes to the point about reasonable, reasonable cause here is that it's our contention that the tax court erred because it did not consider whether or not you could have a reasonable misunderstanding of fact for a basis of reasonable cause. What have the parties to the agreement done to amend the agreement to read, that we agree, that we made a mutual, that means both of us, mutual mistake. We're going to fix it and re-paper the transaction. Was that done? There has not, there has never been a state court action to reform the agreement. Well, you don't have to have a state court action. If it's a mutual mistake, the parties can say, hey, you're right. We're going to, we're going to withdraw that and redo it. In most, in most cases, at least I've found, whenever there is a, you know, this problem didn't actually surface until the IRS audited McRick's tax return. Right. And they could say we're going to make this retroactive. I mean, the point is, was there any attempt on the other side to say, yeah, let's see if we can redo this, or re-paper this deal, or? There were some discussions between Mark Kisner and Mr. Brunson after the fact saying, hey, look, we made this mistake, and granted this is not in the record, but ultimately Mr. Brunson did not give that testimony in his affidavit that was provided to the court. So there were some discussions about it, but nothing ever materialized out of it. That's what I'm, here's the tax courts for a third party, and it seems to me you need, either need to go to court to get it changed, or get the parties by agreement to change it. Well, the case. Because as it sits right now, the transaction stands as it is. Well, Danielson, the Danielson case that's adopted in this court, Inspector, finds that Terry's parties may vary the terms of their unambiguous agreements by providing proof in a state court action of evidence of mistake. There is no requirement under Danielson or Specter, and I have found no cases that say you actually have to institute a state court action in order to have the tax court reform the agreement or change the tax consequences in this particular case. So, moving on now, Your Honors, to the question about reasonable cause and good faith, which. Just one further question about the characterization of the transaction. You, it is your burden to show clear error, right? Yes, it is, Your Honor. Okay. So, moving on now to the reasonable cause and good faith, we believe the tax court erred because it failed to consider a separate basis for why you should have reasonable cause. The tax court's opinion was very short, almost barely three pages in terms of the reasonable cause and good faith section of the analysis, and it basically focused on whether the taxpayer relied on its advisor for the proper reporting of the transaction. It looked at whether the advisor, whose name was Miles Harper, looked at whether Harper, where he got the assumption that McRick was the entity that was sold, and it focused very narrowly on information provided by the McRick CFO, Bodler. It concluded that Bodler did not take reasonable steps to determine that his assumption regarding that McRick was sold didn't take reasonable steps to confirm that. You know, this really isn't a reliance issue here. Really, what this is, is an honest misunderstanding of fact. You know, here, Harper is getting information from the shareholders. He's getting information from the CFO. He's got financial statements that are not showing a sale of Alpha. No one really here is contesting that Harper did anything wrong. I think the real issue here is whether or not it was reasonable for the shareholders and McRick to conclude that the sale was for McRick. And we think there are several points that support that. The first is that we have four different people here reaching this same conclusion. All three shareholders, and then a gentleman named O'Brien, who was an investment banker, involved in the transaction. Kisner, the tax court found that Kisner reviewed the stock purchase agreement, multiple drafts, and the final drafts, and he concluded that it was for a sale of McRick. O'Brien, in an email to Bodler, also said, I read the stock purchase agreement, and I concluded that it was for a sale of McRick. So, right there, we have two people, Kisner, who's the CEO and the lead negotiator, and O'Brien. What's Kisner's background? Is this some kind of software company, or what? It's an electronic manufacturing business. Well, I don't understand what that is. I think they create circuit boards for various machinery, and his background is engineering. He was more in Texas Instruments. He was working at Texas Instruments. He's not a lawyer. He's a businessman, and he's an engineer. He paid his lawyer to make sure that the deal was structured properly. You know, as a businessman, there are two things you're usually concerned about. How much am I going to get paid, and what are my obligations moving forward under the agreement? The tax court found that when he reviewed the document, it called for the sale that he was looking for, and that's specifically the agreement he negotiated with his counterpart on the other side. You know, some other factors that show the... The other side didn't care how it was structured either, though, right? They basically didn't care. They were willing to go along with whatever MACRC advocated for its tax purposes. That is what Kisner testified to, and that's also what David... I mean, that's sort of like more than mutual mistake. It's more like on the one side, it's an intent to secure tax benefits, and on the other side, it's I don't care. So it's hard to say whether that creates the groundwork for a mutual mistake. I agree, Your Honor, that... And the tax court ultimately concluded that that was insufficient, although we think the evidence suggests otherwise. How that relates to reasonable cause, though, is you have Kisner here, the lead negotiator. In his mind, he's being told by Brunson, we'll do the deal however you want, and the tax court found that testimony credible. It finds that we reach an agreement for this particular structure as you've laid out. After that, he reviews the agreements. The tax court finds that he thought it called for a sale of MACRC. So, you know, at the very least, it's a unilateral mistake, again, going to the misunderstanding of fact, which is a separate basis for a reasonable cause here. The government is going to come up here and likely say, well, Kisner should have looked at the stock purchase agreement. Kisner should have talked with the lawyer. He did look at the stock purchase agreement, and the tax court found he thought it concluded otherwise. We have a second gentleman, O'Brien, who, despite the tax court's findings saying that there was no qualifications about O'Brien, he's an executive vice president of the investment banking firm that was paid $500,000 to market and sell this particular transaction. I hope he's suing them, too. He's also present throughout the process here. He's on the email that Kisner sends to buyer's counsel saying, hey, here's our deal that we reached. O'Brien has copied on that. You know, you're one of the best, you know, you're a fine tax litigating firm, but this deal about whether you're selling the company's shares or the company is selling shares of a sub is not rocket science from the standpoint of tax advice, is it? No. I would concur that it's pretty easy to not do that, which is, which. No, it's pretty, it's, right, exactly. It's easy to avoid this particular mistake. Right. Right. Now, we were not, I want to make clear for the record, we were not. I know you weren't. We were not counseled for this particular transaction. Well, that's my point. I mean, this, you know, you're, you have guys who sold this company for $16 million. Sixteen and a half million dollars, which it does seem implausible that someone could make this type of mistake. I have, that's, the preparer, I mean, surely, I, it's hard to me to fathom how you could prepare a tax return for this transaction without looking at the documentation. Well, Your Honor, the, Kisner again, he did look at the document. I'm talking about the actual tax preparer for the short year. You know. For Mack Rick's short year. You know, this, it's actually a pretty easy transaction, though. You have a stock, you got a sales price, you have basis, meaning the investment or the cost for the particular item, just like, just like a sale of a house. All of that information was provided to the accountant here. And, you know, in our mind, at least, there's no real need to provide him with the stock purchase agreement. It deals with representations and warranties, indemnities. It's not all that clear that he would have had a reason to ask for it. But that, but that said, you know, there's the old phrase, garbage in, garbage out. And again, the people who should have done something about the garbage were Kisner and Gary Miller. That is true, Your Honor. But I go back to the tax court finding that, the tax court did not actually find that there was a unilateral mistake by Kisner, but it found that he read the document and concluded otherwise. May I finish my sentence? I just got the red light. Go ahead. Finish the sentence. You know, it did conclude otherwise, and there's no determination by the tax court that that conclusion was unreasonable. There was no analysis by the tax court about honest misunderstanding of fact. It was limited very narrowly just to the reliance argument by. You must admit that's a fact question, good faith or not, isn't it? It is a fact question. That's right. However, I think the evidence is sufficiently present here for you, for this court to render a decision on that particular issue. All right. Thank you. Thank you very much. You deserve your rebuttal time. All right. Counsel, do you pronounce it Weiner or Weiner? I pronounce it Weiner, Your Honor. Weiner? Good. That's easy for me to remember. Good morning, and may it please the court. Andy Weiner for the Commissioner of Internal Revenue. What happened here as a factual matter is that MacRick sold the SOP of Alpha, its operating subsidiary, and the tax consequences that flow from that are based on that economic reality. To put it in a different way, the substance controls for tax purposes. Now, when the government disagrees as to how people characterize a transaction, the form of a transaction, the taxpayer, the government has the ability to argue substance over form, when a taxpayer disagrees with how the form has been, how the form of a transaction, then traditionally, the government has been able to hold the taxpayer to the form of the transaction, because the transaction, the taxpayer dictates that form in the first place. And so, what the Danielson rule has developed is an exception to that rule that taxpayers are held to the form of their transaction. What Danielson does not do, and what taxpayers' entire case is based on, is this idea that Danielson is a way to change the substance of what happened. It is not an exception to the fact that substance controls for tax purposes. And so, in this case, if taxpayers had actually believed that there was a mutual mistake that required reformation, they would need to bring a reformation action or, as Judge Owen had said, come to some understanding in which to unwind what happened before and to implement the terms as contemplated by the parties. However, here, you have an affidavit by the counterparty, TS3, by its CEO, Brunson, that states, clear as day, that they intended to purchase the shares of Alpha, and that's what they did. And if MACRC had wanted to sell its own shares, then TS3 would have been amenable to that. But they clearly understood the transaction as it actually occurred and as it was documented. As well, you have multiple other sources. We're not just talking about the stock purchase agreement and the dozens of... Well, is it fair to say that there's evidence on both sides as to whether the purchaser made a... It was mutual from the purchaser's standpoint. There's some evidence that it was a mutual mistake from the purchaser's standpoint, but there's other evidence that it was not a mutual mistake from the purchaser's standpoint. Is that a fair characterization of the record? Respectfully, Your Honor, I don't believe so. And I don't know what, from the purchaser's standpoint, you've got Brunson's affidavit, you've got the stock purchase agreement, you've got the 12 drafts of the stock purchase agreement that preceded it, you've got... Well, it seems to me that if the evidence is conflicting, then the tax court wins, so it doesn't really matter. Correct. Correct, Your Honor. And again, to sort of tie back to my original point, even if there was mutual mistake, Danielson doesn't allow them to get the tax consequences of a transaction that they admit never happened. If they wanted to be taxed as if they sold the MACRC shares, then that's what actually has to happen for tax purposes. And so the mutual mistake, I don't think the court even really needs to reach the question as to whether there was mutual mistake, but you're right. So long as there's conflicting evidence, there's some evidence to suggest that there was at one point in agreement, seven months before the closing, in which the structure was suggested that MACRC shareholders would sell its MACRC stock. But there's no evidence subsequent to that for the next seven months through, you know, multiple iterations of stock purchase agreement, through all the other documents that were drafted and signed at closing, all of those reflect the transaction that actually occurred, which was MACRC sold its alpha stock. And that's the transaction that the government issued its deficiency notice based on, saying MACRC, you've reflected no income from your sale of alpha stock, and you in fact sold that stock. Moving on to the question of good faith and reasonable reliance, there is no evidence that MACRC took any affirmative actions to determine that the information it was providing to its accountant to prepare the return, reflecting that MACRC didn't sell its alpha stock, that they confirmed the actual terms of their transaction. You have the accountant testified at trial that the CFO, a man named Baudler, had called him up to say, we need to prepare a short year return, and here's the financial information with which to do that. They did pay capital gains on the sale though, right? The individuals did? I believe so, Your Honor. Yes, they did. And is that taken into account in the good faith discussion? Well, no, Your Honor. I don't believe it would be, because the question is whether MACRC had good faith, not whether the shareholders had good faith. I mean, MACRC is, for tax purposes, an independent entity. MACRC is a, well, I understand it's an independent entity, but Keisner was the, they, two of them were the operating heads of MACRC, and I'm just wondering about that. So did they get refunds of the capital gains that they paid, or offsets, or anything like that? Well, I mean, so assuming, I would hope that they filed amended returns to, you know, to correct the, I, the government is not interested in double taxing these people at both, you know, to say that the MACRC shares were sold and the alpha shares. The question, from the government's perspective, is getting it right. You sold your alpha shares, MACRC, and so you need to pay tax on that. Now, we're also not suggesting that anything nefarious, you know, was going on here, but at the same time is that taxpayers have an affirmative obligation to take reasonable steps to make sure that they file accurate returns. Well, that's, you're, but you're just saying now it's mandatory, there's no good faith. I mean, yes, reasonable is one thing, but that's still not necessarily unreasonableness. You can be in good faith and be unreasonable. Good faith is good faith. It's a different standard than reasonableness, isn't it? I, from, from the perspective, from the standpoint as a defense to penalty liability under the Internal Revenue Code, I don't believe that's correct, Your Honor, because of the regulations under 1664-4, in which the regulations say that taxpayers, the, the, the single biggest component of determining whether it was good faith was taxpayers' efforts in which to make sure that they determine their proper tax liability. And so, and there are, and we cited a few cases in our, in our brief where taxpayers effectively can't stick their head in the sand. And then say that, you know, I didn't, I had no information to the contrary. And so, therefore, therefore, I shouldn't be liable for underpaying my taxes. The, the way that the, the way that the self-reporting or self-reporting tax system works and the way that the penalty regime works is no, you can't, in fact, ignore or fail to disclose certain information that is relevant to your tax liability. It would be as if they were sent 1099s or a letter from the opposing side saying, we paid you $16.5 million, here's the reason for it. And then they never opened that letter. And they said, eh, my recollection is that we got paid $16.5 million for this reason, but it turned out to be another reason. And they've got a letter sitting right there that they never opened that disputes that fact. Well, effectively, that's exactly what happened here. They had a stock purchase agreement that if you get to literally the first operative provision of that agreement, it discloses or it debunks what they represented to their accountant. As well as a side letter, corporate governance documents, and, and the bottom line is that Baudouin never testified as to the basis, he never testified at all. And so, there's no telling what he did or did not do in order to determine what the terms of the transaction were. Kisler did testify, but said only that he had an opportunity to review the stock purchase agreement and that he looked at it. He didn't explain how he could have misconstrued the document. He didn't, I mean, looking at it could mean that he just made sure that it provided for the payment of $16.5 million. And, and as well, I mean, you, again, you have multiple other documents that he signed that, that were prepared in conjunction with this closing that would have disclosed him saying, like, wait a second. This is, to the extent that he genuinely believed this, this is not the transaction that you contemplated. Nor did Kisler ever testify to the fact that he had any conversations with his attorney and his attorney affirmatively told him that it was the matrix shares that were being sold. Nor did he have any testifies to any conversations that he had with his, with his investment bank. And specifically in terms of what he provided to, to the accountant, he said that, well, three shareholders were questioned with respect to their own personal returns as to what they gave to Harper, who was the, who was the accountant. And Kisler said, I didn't really need to give him anything. He knew it all. He didn't say that he provided the stock purchase agreement. The other shareholders said that they, one of the shareholders testified that he didn't actually read the stock purchase agreement. And one of them said that he assumed he did, but couldn't remember. And so the bottom line is that you really have no affirmative steps. There's nothing in the record that would actually support tangibly that they took affirmative steps to make sure that what they were submitting to the government for a $16.5 million transaction was accurate. And unless there are any other questions, Your Honor, we would just ask that the Court affirm the decision. Thank you. Thank you, sir. Thank you. All right, Mr. Cheney, you've revoked, yeah? Can I get Mr. Weiner's additional 10 minutes? Just kidding. No, sir, you do not. There's no harm in asking, but the answers are quick. Okay. I'd like to focus on the, on the penalty discussion. I think we have talked about mutual mistake sufficiently, so I'd like to focus really on that and respond to a few things that Mr. Weiner said. So, you know, Mr. Weiner is correct that generally the most important thing to look at when determining reasonable cause and good faith is. He told me, Weiner. Weiner? Oh, I'm sorry. Reasonable cause and good faith is the taxpayer's effort to determine his liability. However, that regulation also says that reasonable cause and good faith can be determined, can be demonstrated if the taxpayer has an honest misunderstanding of fact. And that honest misunderstanding of fact has to be reasonable in light of all the facts and circumstances. And we think here that it was. The tax court found, contrary to what Mr. Weiner said, that Kisner reviewed the stock purchase agreements, the prior drafts, and he concluded that the documents provided that McRick's shareholder would sell their McRick stock. That's on page 22 of the opinion. That's not my characterization. That's the tax court's characterization. So when Mr. Weiner talks about we should give deference to the trial court's finding of fact, that's one that would support at least a unilateral mistake on Mr. Kisner with respect to this particular issue. Second, Mr. Kisner and the rest of the shareholders received proceeds directly from the buyer into their particular bank accounts. If you're a taxpayer and you're a businessman and money goes straight to you and it's supposed to go to a corporation instead, what would you think? I think the conclusion right there is very reasonably, I sold my McRick stock. That's, they are the ones who ultimately got the money. And, you know, the focus in the tax court's opinion, again, was reliance. And we think that's misplaced because really. Why would they do that? Why would the purchaser have done that? I don't know why they agreed to do that. I mean, since they were, if they wrote the document, I don't. Your Honor, I don't, I don't know why the purchaser agreed to do that. That may have been something they negotiated. That's not in the record. But there is a document in the record that specifically states that money is being transferred to the taxpayer, to the shareholders directly. I believe it's exhibit 14J in the stipulation of facts. That's record number 22. You know, and Mr. Weiner also referenced some cases in which taxpayers had conflicting information. And those cases, I think, are easily distinguished in that the opposing side in those particular transactions provided information in addition to the documents that were the basis of a particular transaction, showing that they were going to report information differently than what the taxpayer was choosing. For example, and I think it's 106 limited, which was a tax shelter case. I'm sorry, not 106 in Chai, which was a tax shelter case. The opposing side told the taxpayer, I'm going to issue you a 1099 that's going to report differently than your conclusion that you have capital gains. And that particular taxpayer didn't provide a 1099 to the accountant. Again, that's a reliance argument. But I think that's different than our situation. In our situation, our clients reviewed, I mean, the taxpayers reviewed, the shareholders reviewed the document and came to an incorrect conclusion. But just so there was no reason for them to give the stock purchase agreement to the accountant because they had no reason to think there was anything wrong with it. Similarly, there was no reason for them to go back to their lawyer because they didn't think there was a problem with the transaction. If the other side had come forward and said something that would put them on notice, I would agree with Mr. Weiner. But that didn't happen in this particular case. Now, granted, the elephant in the room is, well, the document says something else. But smart people can make mistakes also. And that can happen in this situation. And we believe that the evidence shows that out. So if there are no further questions. All right. Thank you. Counsel on both sides of the briefing, the case will be submitted and we will decide it. This concludes the first two days of the panel with me on it. Tomorrow, the panel will reconvene with Judge Engelhardt. We stand in recess until 9 a.m.